IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-30215-DRH |
| | ) | |
| MICHAEL C. FINTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION *IN LIMINE* REGARDING ENTRAPMENT DEFENSE**

The United States of America, by its attorneys, James A. Lewis, United States Attorney for the Central District of Illinois, Assistant United States Attorney Eric Long, and Department of Justice Trial Attorney Alamdar Hamdani, moves *in limine* for a pretrial order precluding the defendant, Michael Finton ("Finton"), from raising a factually and legally unfounded entrapment defense.

**Introduction**

The decisive question in this motion is whether the Court should preclude Finton from arguing an entrapment defense to the jury. This question is properly before the Court at the pre-trial stage because, when claiming an entrapment defense, a defendant must proffer evidence of both defense elements, namely lack of predisposition and extraordinary government inducement. Finton cannot. Indeed, no evidence exists to support either element of the defense. To the contrary, the evidence overwhelmingly demonstrates Finton's predisposition and desire to commit the crimes. Under Seventh Circuit case law, this should end the analysis.

1

But, if the Court considers governmental inducement, there is no evidence that the government enticed Finton to commit the charged crimes by means of extraordinary inducement. It simply provided Finton with an opportunity, and an opportunity is not an extraordinary inducement. Thus, the Court should bar the defendant from presenting an entrapment defense, including inferring it through witness examination.

### Factual Background

On September 23, 2009, Finton attempted to blow up the Paul Findley Courthouse and Federal Building (the "Federal Building") in Springfield, Illinois, and in so doing, attempted to kill the employees that worked inside that building. The evidence at trial will include video and audio recordings of Finton planning and carrying out the attack. The recordings will show him driving the bomb to the courthouse, parking it outside, and then attempting to detonate the bomb by dialing a telephone number, which he thought was a remote triggering device. All of this evidence will be uncontroverted.

Moreover, none of the evidence at trial will support a colorable claim of entrapment because Finton, himself, made his intentions clear by repeatedly describing his long-held desire to attack the federal government and attempting to justify such an attack. Indeed, as the plot materialized, Finton took on a leadership role, directing certain aspects of the plan and attempting to recruit others into it, buttressing the notion that he was predisposed.

**A.  A government source introduced himself to Finton.**

In late fall 2008, government agents asked a confidential Source ("the Source"), who the United States anticipates will testify at trial, to make contact with Finton, get acquainted with

2

him on a casual basis, and report back to the agents.  The initial contacts between the Source and Finton were unrecorded, but their later conversations were recorded.

By the end of December, 2008, the Source had learned that Finton was seeking military training and wanted to travel to the Gaza Strip to fight Israel on behalf of the Palestinians. Specifically, Finton stated that he wanted to secure his place in Paradise by becoming a "mujahid" (Arabic for one who wages jihad).  On or about January 2, 2009, Finton told the Source that he was planning on contacting an unidentified person in Egypt in an attempt to find a way into Gaza.

At that point, the Source suggested to Finton that he knew someone who might be able to help Finton.  Finton, according to the Source, wanted to make that contact.  After that, the Source recorded his conversations with Finton. Over the next month, 7-8 months before the September 23, 2009 attempted bombing, Finton repeatedly confirmed his desire to obtain terroristic, military training.  Finton wanted to join one of a variety of terrorist organizations, depending on where he might choose to engage in jihad and attacks he was prepared to undertake.  During those conversations, Finton expressed reservations about al Qaeda because al Qaeda targeted civilians, but Finton made clear that if the targets were soldiers, politicians, or generals, he was "their man." Although the Source repeatedly told Finton to think carefully about his request, Finton reiterated his desire, explaining to the Source that his answer remained the same and that "[n]obody pushin' nothin' on me."

So, at Finton's request, the Source provided Finton an email address to contact someone who could help Finton achieve his stated desires.  During that conversation with the Source, Finton said he would rather die as a "shaheed" (Arabic for martyr) than live his life in America.

3

### B. Finton initiated contact with the Undercover Agent.

Later that day, February 4, 2009, Finton initiated contact with the undercover FBI employee ("UCE") by sending an introductory email message from talib_islam@hotmail.com to the email address provided by the Source.  Shortly thereafter, at the request of the UCE, Finton took two more steps to facilitate the confidential communications with the UCE.  First, Finton obtained an e-mail account through "hushmail.com," which purportedly would allow Finton and the UCE to communicate through an encrypted system.  Second, Finton reportedly obtained a pre-paid cellular phone to ensure that no one was listening to their calls.

Over the course of the next two months, Finton communicated with the UCE by e-mail and telephone.  In just his second e-mail to the UCE, Finton succinctly described his predisposition, stating that he wished to live the life of an "alim" (Arabic for a Muslim religious scholar) and repeating his intention to die "the death of a shaheed" (Arabic for martyr).

Finton met the UCE for the first time on April 2, 2009, at a hotel in Collinsville, Illinois. During this meeting, Finton and the UCE spoke generally about where the relationship might go. The UCE told Finton that their meeting was similar to a job interview, and that he was there to assess Finton. The meeting took place in the hotel's lobby and over a meal paid for by the UCE.

Finton spent much of the time trying to sell the UCE on his attributes.  He also intimated that he wanted training and "once people feel that I know what I need to know, then I'm going where . . . it's felt I'm best put . . . where I best put to use."  Finton explained that he was willing to "kill generals, politicians, [and] other people who are responsible for these things" and that he had felt that way from the time he first became a Muslim, which had occurred a couple years

4

prior to his meeting with the UCE.   Finton also told the UCE that "if I were standing behind the current Prime Minister [presumably of Israel] and I knew I could do it, and you know, get it done and, I, I would do it.  No questions asked . . . ."  Thus, there was no doubt as to Finton's predisposition for terrorist training and ultimately for killing.

### C.  Finton agreed to join al Qaeda.

On May 6, 2009, the UCE again met with Finton, this time in a guest room at a Springfield hotel.  During this recorded conversation, the UCE probed Finton about his intentions.  Finton indicated that he wanted to receive military-type training.  Finton said he was not interested in being a suicide bomber and that he would rather carry a gun on the front lines overseas.  Finton indicated that he did not want to attack civilians, but said that if the targets were military or political, he had "no problem at all" with that.  The UCE repeatedly told Finton that he could walk away at any time and never speak to the UCE again.  Finton said he had thought about it for a long time and wanted to be involved.

During this meeting, the UCE informed Finton that he was part of al Qaeda.  The UCE offered Finton the opportunity to become "operational."  Finton replied in Arabic, "God is the greatest," thereby expressing his desire to join.

Later in the meeting, the UCE showed Finton a video of a purported al Qaeda training camp.  Finton, without prompting, immediately identified the al Qaeda flag.  He also stated, referring to the video, "This is where I want to be right now."  After justifying his decision to be a part of al Qaeda, Finton told the UCE that he had "felt this way a long time ago."

During this meeting, Finton also accepted his first task in support of al Qaeda.  The UCE explained to Finton that al Qaeda needs to be able to communicate with its members, and that to

5

do so, it effectively has to launder the mail to make it appear as if it is originating from somewhere other than where it actually is. The UCE asked Finton to open a Post Office Box and forward mail without looking at it.  Finton agreed.

The UCE provided Finton two items of limited value during this meeting.  First, the UCE provided Finton a cellular telephone with pre-paid minutes; total cost was $269.36.  Finton understood that the phone was provided to him to simplify communications between the UCE and Finton.  Second, the UCE bought Finton lunch at Red Lobster.

The next day, Finton told the Source that he had prayed for this opportunity since before he had met the Source.  Finton went on to recognize that what he was doing was illegal ("I know the consequences of even going and having the conversation we was having") and described for the Source how he would react if he were caught by the police.

**D.  Finton began to formulate his plan and took steps to support al Qaeda.**

On July 2, 2009, Finton again met with the UCE in a Springfield hotel room.  During their recorded conversation, the UCE and Finton dined on a meal ordered from room service and paid for by the UCE.  The two also talked about operational objectives.  Specifically, the UCE asked Finton about possible targets in the United States.  Finton replied that he had already been thinking about it, noting his positive impressions of the Mumbai terrorist attack in India.  He also stated that he preferred targets such as government buildings, banks, and police stations.

The UCE then asked Finton to purchase various electronic components, explaining that he intended to send the components to "our brothers" on both fronts to kill American soldiers. Finton replied in Arabic, "praise be to God."  The UCE clarified that these parts would be used to kill American soldiers, "dead, right now."  With this knowledge, Finton agreed to purchase the

6

parts.  Indeed, although the UCE offered to front Finton the money to purchase the components, Finton preferred to simply be reimbursed when he delivered the parts.  Finton later said that it had been his intention for some time to do exactly what they were talking about doing.  He said he wanted to see the American government fall, and said he saw himself as fighting for freedom for the Muslim people.

The UCE then asked if Finton would have any hesitation stashing a backpack (containing explosives) somewhere.  Finton expressed no reservations, and instead proposed suggestions for doing so.  Finton again repeated that he had been thinking over the past couple of weeks about something like this already, and spoke of the potential impact on the government from his intended attack.  Finton concluded, "I'm ready to go."

### E.  Finton identified his target and initiated surveillance.

On July 29, 2009, Finton again met with the UCE in a hotel room in Springfield.  At the outset of the meeting, Finton provided a clear understanding into his beliefs.  He stated, "The objective of the army itself has to be victory, rather than shaheed (Arabic for martyr).  Shaheed is more the objective of the individual…This is the way I think. … I'm trying to…just do my part."

Finton spent the remainder of the meeting planning the attack with the UCE.  Finton rejected a backpack bomb attack on a police station.  Instead, he proposed the Federal Building in Springfield (the Paul Findley Federal Building and Courthouse, located at 600 East Monroe Street, Springfield, Illinois).  Finton also proposed that they use a car bomb parked in front of the building instead of a smaller backpack bomb.  Because the room in which they were located happened to overlook the Federal Building, Finton took the UCE to the window to point it out to him, and then used a laptop computer to show the UCE the view of the building available on the

7

internet.  Finton proposed that they use two bombs, the first to do the initial damage and draw in emergency responders, and the second to attack the emergency personnel.

Shortly thereafter, Finton suggested a "dry run."  Finton left the hotel and entered the Federal Building.  Upon arrival, Finton engaged the Court Security Officer in a brief conversation about Paul Findley, for whom the building is named.  After Finton learned that he could not pass security, he returned to the hotel.

Finton reported to the UCE that it was not feasible to smuggle a backpack bomb past building security.  Finton again suggested that they park a car bomb in front of the Federal Building near Congressman Aaron Schock's office and detonate it remotely.  According to Finton, if the bomb was big enough, it could potentially take out part of the Federal Building and all of the Congressman's office.  Finton told the UCE he was serious, and that he had "more things in sight."

During their meeting, Finton also delivered the electronic components discussed during the previous meeting.  The UCE said "American soldiers are going to die."  On the video, Finton can be seen smiling as he pulls the electronic components from his bag.

Like the other meetings, the UCE provided Finton minimal benefits.  First, prior to the meeting, the UCE added $110 worth of pre-paid minutes to the cellular phone previously given to Finton.  Second, the UCE reimbursed Finton for the electronic parts and the cost of gas, giving Finton $95 for the parts, $30 for gas, and $10 for cigarettes.  Finally, the UCE paid for Finton's meal, which was ordered through the hotel's room service.

### F.  Finton focuses his planned attack on the Federal Building.

Later on July 29, after Finton left the hotel and returned to Decatur, he met with the Source. During their recorded conversation, Finton described his plan to the Source.  By the end, Finton attempted to recruit the Source to participate in the attack, telling the Source that a plan with two car bombs requires two drivers.  Importantly, Finton again explained to the Source that he had been praying for this opportunity since he became a Muslim.  As Finton explained, from the moment he converted, he made big prayers and each one had progressively been granted.

On August 14, 2009, Finton again met with the UCE in a hotel room in Springfield. During that audio and video recorded meeting, the UCE told Finton that "they" (the UCE's purported leaders) loved Finton's idea, and told Finton that they would provide the vehicle and bomb for Finton to park in front of the Federal Building.  Finton said he thought the attack would be the first domino for America to fall.  He opined that it would cause the government to bring soldiers currently deployed overseas home to protect the United States.  The UCE asked if Finton was ready to go with the plan.  Finton replied that he was, stating in Arabic, "praise be to God." They then left the hotel and did drive-by surveillance of the Federal Building.

During this meeting, the UCE purchased Finton a cup of coffee and gave him $50 for gas and to reimburse the costs of passport photos. Finton gave the UCE passport photos at this meeting for the passport he thought he needed to flee the United States after he bombed the Federal Building.

On September 1, 2009, Finton met with the UCE in a hotel room in Springfield.  The UCE told Finton that the planned attack would take place right after the end of Ramadan (which began on August 22 and was to end on September 20).  The two discussed the plan at length.

9

The UCE told Finton that the vehicle would be carrying close to a ton of explosives, which Finton speculated would destroy half the building.  The UCE corrected Finton, telling him that the whole building would be gone.  The UCE said that, hopefully, that would be the last day for all of those federal employees and the Congressman.  Finton replied, in Arabic, "God willing."

Finton later demonstrated his clear understanding of the plan and the intended consequences.  Finton told the Source that there would be a ton of explosives and that it would take out the Federal Building.  Finton also hoped the Congressman would be in his office that day because the blast would take out his office.  He explained that civilian casualties would be inevitable and justified, and that everyone in the Federal Building would be killed.

And why was he doing this?  Finton explained to the UCE that it was not because of money, instead he explained "I'm doin' what I'm doin' because I'm hopin' that the number one goal I'm hoping to happen is, Israel's um, big bully in the back. Y'know, is not gonna be there any more. Inshallah."  Later in that meeting, after the UCE explained that after the bombing the two of them would leave the country with the hope of coming back in a "couple years."  Finton finished the UCE's sentence by stating "[c]ause we wanna do it again."

**G.  Finton attempted to execute his planned attack.**

On September 23, 2009, Finton arrived in Springfield hours ahead of schedule, clearly excited about the impending events.  The Source drove Finton from Decatur to Springfield that morning, and during their time together, Finton told the Source that he was "technically the mastermind behind this whole thing because, I planned this . . . they didn't go totally with my idea, I was in favor of the twin car bombing, that's what I wanted to do."  And at the end of the

10

conversation, Finton told the Source that he would drink tea with him in heaven and parted for the UCE.

Once Finton met the UCE, the UCE drove to a location in Springfield where a van containing the purported bomb was located. The UCE showed Finton how to arm the bomb, which Finton did in the UCE's presence. Then, Finton drove the bomb-laden van to the federal building. As they drove, the UCE told Finton by telephone that they had information that the Congressman was in his office. Finton expressed great pleasure in learning this. At the intersection of Sixth Street and Monroe Street, Finton turned the corner and parked the van in a yellow, no parking area directly in front of the northwest corner of the Federal Building. Finton got out of the van, locked the door, and got into the UCE's vehicle. The UCE and Finton then drove away from the area.

As they drove, Finton attempted to detonate the bomb by dialing the number that he thought would trigger the explosives. When the first attempt failed, Finton dialed the number again. At this point, he was arrested.

**H.  Finton justified his planned attack.**

Throughout the recordings leading up to the day of the attack, Finton justified his intentions. On August 14 with the UCE and again on August 17 with the Source, Finton recorded himself justifying the planned attack. The recordings were all very similar, consisting primarily of political justifications, with religious overtones, for attacking the United States. Finton spoke of his belief that America was at war with Islam and that Muslims would fight back to stop America at any cost.

11

In asking the Source for help with the recordings on August 17, Finton told the Source that it was his biggest dream to be the first domino to fall, to be the one who brought the United States government crashing down.  Finton also said that if his deeds were accepted (by God), then his sins would be forgiven because of his intention.

## Argument

Entrapment is an affirmative defense, which requires the defendant to present sufficient evidence for a reasonable jury to find that he or she was entrapped into committing the crime charged. *Mathews v. United States*, 485 U.S. 58, 63 (1988); *United States v. Santiago-Godinez*, 12 F.3d 722, 727 (7th Cir. 1993).  The defendant must present sufficient evidence to "prove that he was (1) induced by someone working for or on behalf of the government to commit a crime that he was (2) not predisposed to commit." *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991); *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010).  "When claiming entrapment, a defendant must proffer evidence in support of both of the elements of entrapment."  *United States v. Millet*, 510 F.3d 668, 675 (7th Cir. 2007).  *See also Hall*, 608 F.3d at 345 (district court granted motion in limine precluding evidence on entrapment).  "If the evidence shows the defendant's predisposition, the entrapment defense should be rejected without any inquiry into government inducement."  *Hall*, 608 F.3d at 343.

### A.  No evidence exists that would support an entrapment defense.

Even when all admissible facts are taken in the light most favorable to Finton, there exists no set of provable facts that would support an entrapment defense.  The United States has reviewed all its evidence and requested reciprocal discovery from Finton.  To date, Finton has produced nothing.  The Government's evidence demonstrates Finton's predisposition to engage

in criminal, terroristic behavior, and, at the same time, is void of any extraordinary inducement from the government.  Without some preliminary showing that entrapment evidence exists, this Court should bar Finton from presenting the defense, including arguing it to the jury or asking questions that suggest the government entrapped him.

> **1.  Finton cannot show he lacked predisposition to commit the charged crimes.**

In determining whether a defendant was predisposed to commit a crime, the Seventh Circuit considers the following factors:

> (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in criminal activity for a profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government.

*Hall*, 608 F.3d at 343 *(quoting United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999)). "No individual factor controls the issue of predisposition, but the most important factor is whether the defendant was reluctant to commit the offense."  *Id.*

Each of these factors supports a finding that the entrapment defense is unwarranted. Importantly, Finton demonstrated no reluctance. Far from it, during the government interaction with him, Finton aggressively advocated for his own plan to blow up the Federal Building and its occupants using multiple car bombs.  Although the government pretended to provide the means for the defendant to carry out his large-scale attack, it was Finton's own plan, born from his self-professed "mastermind," that he carried out on September 23.

13

### a. Character and Reputation

Finton has a criminal history that shows his character and reputation and that predates his interaction with law enforcement in this case.  On July 7, 1999, Finton was sentenced to serve 12 years imprisonment for his role in an aggravated robbery and 4 years for aggravated battery, causing great bodily harm.  Finton briefly explained this event to the Source, telling him that he (Finton) walked into a business with a mask and "started swinging," i.e. throwing punches at everybody.  This led to his arrest on February 4, 1999, and his incarceration from July 12, 1999 until May 1, 2006.

Finton also admitted that he has prayed for the opportunity to commit jihad years before he ever interacted with the Source or the UCE.  For example, the day after the second meeting with the UCE, Finton told the Source that he had prayed for the opportunity presented by the UCE to get terroristic training before he had met the Source.  And on July 29, after Finton and the UCE had settled on bombing the Paul Findley Federal Building, Finton told the Source that he had been praying for this opportunity, telling him that he had prayed for it from the moment he converted to Islam.  He explained that he had made big prayers toward this end, and each prayer had progressively been granted over the past few months.

Just as importantly, Finton actually carried out the plan.  He drove a van carrying what he believed to be a one ton bomb to the Federal Building, parked it, and then attempted to detonate the bomb by dialing a cellular phone number, which he thought was a remote triggering device. Finton knew the bomb would destroy the entire Federal Building, along with the neighboring Congressman's office, and kill the people working inside.  This conduct alone demonstrates Finton's character.

14

Finton's character is further exemplified by his efforts to plan and commit the illegal activities. First, Finton purchased electronic components that he thought would be used to create bombs to kill American soldiers. Incredibly, Finton even tried to recruit the Source to purchase additional components.

On July 29, Finton planned the attack with the UCE. Finton rejected the notion of placing a backpack bomb at a police station because of the challenges associated with smuggling in the bomb. Instead, Finton proposed the Federal Building in Springfield. Finton then escalated the proposed plan, suggesting a car bomb be parked in front of the building instead of a smaller backpack bomb. Finton also used a computer to demonstrate the ease with which they could perform remote surveillance. Finton wanted an even larger attack. He proposed two car bombs, the first to do the initial damage and draw in emergency responders, and the second to attack the emergency personnel.

Shortly thereafter, Finton suggested and performed a "dry run" on the Federal Building to determine the feasibility of smuggling a backpack bomb past building security. After Finton decided that this plan would not work, he again suggested, for a "big bang", parking a car bomb in front of the Federal Building near the Congressman's office. Finton speculated that such a bomb could destroy part of the Federal Building and all of the Congressman's office. Someone who lacked the predisposition to commit these crimes would not have participated in the planning, let alone escalated the plan the way Finton did or recruit others to take part.

Beyond his conduct, Finton's own words reflect his true character. In the very early stages of the operation, Finton expressed his desire to join one of a variety of terrorist organizations. Although Finton expressed some early reservations about al Qaeda because al

15

Qaeda targeted civilians, Finton made clear that if the targets were soldiers, politicians, or generals, he was "their man."

Finton repeatedly expressed his desire to be a martyr for his cause. At the time the Source gave Finton the UCE's email address, Finton said he would rather die as a "shaheed" (Arabic for martyr) than to live his life in America. This feeling was reiterated to the UCE in his first confidential e-mail, in which Finton stated that he wanted to live the life of a scholar and die the death of a shaheed. During the meeting on July 29, 2009, Finton again clarified his feelings. He stated, "[t]he objective of the army itself has to be victory, rather than shaheed. Shaheed is more the objective of the individual…This is the way I think. … I'm trying to…just do my part."

Moreover, Finton consistently stated that he had wanted to commit such an act for some time. During the May 6 meeting, the UCE showed Finton a video of a purported al Qaeda training camp. Finton's reaction was telling of his character and predisposition to commit this crime. He immediately identified the al Qaeda flag on the video. He also stated, "This is where I want to be right now." The UCE gave Finton the opportunity to walk out, but Finton not only stayed, he told the UCE that he had "felt this way a long time ago."

On July 2, Finton reiterated his long held desire to commit an act of aggression against the American government. He said he wanted to see the American government fall and that he was fighting for freedom for the Muslim people. When the UCE asked Finton about secretly stashing a backpack containing explosives, Finton expressed no reservations, and instead proposed suggestions for how to accomplish the task. Like before, Finton repeated that he had been thinking over the past couple of weeks about something like this. Finton concluded, "I'm ready to go."

16

Finton also demonstrated his character through his utter disregard for the illegality of the conduct. On May 7, 2009, Finton recognized this, stating "I know the consequences of even going and having the conversation we was having." Rather than expressing concern, Finton simply described how he would react if the police caught him. Finton stated that he would fight the police, try to steal their weapon, and if subdued, refuse to recognize the authority of the government to prosecute him.

### b. Suggestion of Criminal Activity

The second factor supports a finding of predisposition. From the first time the Source introduced himself to Finton, Finton was the one taking the initiative to engage in criminal activity. Finton told the Source that he wanted to participate in terrorist activities overseas. After the Source told Finton that he knew people from prison, Finton asked the Source for a contact person. The Source repeatedly told Finton to think carefully about his decision, but Finton never relented.

After the Source provided Finton an e-mail address for someone who could purportedly help Finton, Finton initiated the contact with the UCE. From there, Finton took steps to advance the communications, obtaining a secret e-mail account and a pre-paid telephone.

Finton was "excited" to jump at every opportunity, as described above. Finton obtained a post office box to help terror communications. Finton obtained electronic components that he was told would be used to kill American soldiers. Finton identified the target he wanted to attack. Finton suggested and performed a "dry run" on that target, the Federal Building. Finton participated in planning the ultimate attack, even trying to escalate the attack from one car bomb to two car bombs. Finton described the plan as "technically [his] mastermind." In essence,

17

Finton took ownership of this operation with the zest of someone who had been praying about something like this for years and someone who was predisposed to commit the crimes he carried out on September 23, 2009.

### c.  Profit from the Criminal Activity

Although this factor is difficult to measure, it nevertheless shows Finton's motivation to commit the crime.  There was little monetary profit to gain from this particular criminal activity.  But, Finton had stated that, as late as September 1, he was not interested in monetary gain.  Instead, he justified his reasons by explaining his hatred for the American government and Israel.  He hoped that his attack would be the first domino in America's fall.

However, Finton also talked about a spiritual reward.  When providing electronic components to the UCE, Finton stated that he would get part of the reward for his role in the attacks on American soldiers.  He often discussed that he would be rewarded with "Jannah," the Arabic word representing the Islamic concept of paradise or heaven.  Thus, while Finton did not apparently seek monetary profit, he was motivated by the spiritual profit he envisioned and the hopeful fall of the American government.

### d.  Reluctance to Commit the Offense

This factor is the most important factor in the predisposition analysis and supports a finding of predisposition in this case.  *Hall*, 608 F.3d at 343.  As the discussion of Finton's behavior demonstrating his character exemplifies, Finton showed and expressed no reluctance.  To the contrary, the Source and the UCE repeatedly cautioned Finton to think carefully about what he wanted to do before doing it, assured him there would be no negative repercussions if he walked away, and even made attempts to discourage him before they finally agreed to go along

18

with his stated desires.  Even more importantly, Finton not only showed no reluctance to commit the criminal activity, he enthusiastically took the lead in developing the basic plan of attack, including picking the target and dramatically increasing the scale of the planned bombing.

From the beginning, Finton took the initiative to pursue these activities.  As discussed above, Finton asked the Source for a contact, then promptly contacted the UCE, obtained an encrypted e-mail account, and bought a separate pre-paid cellular phone.  Finton drove hours to meet the UCE for their first meeting in Collinsville, Illinois.  Then, Finton traveled from Decatur to Springfield to meet with the UCE, often overcoming various obstacles, such as having no transportation and a conflicting work schedule, to attend the meetings.

Finton also energetically participated in the conduct.  When shown the al Qaeda training video, Finton described his feelings as "excited."  This excitement, in turn, was exemplified by the efforts he took to engage the plan, from the post office box to the electronic components to the "dry run" to the actual attack.  Indeed, on the day of the anticipated attack Finton arrived in Springfield nearly three hours early.

Finton even tried to recruit others into his plan.  Specifically, he asked the Source to drive a second bomb, brainstormed ways for the Source to escape to Mexico, and asked the Source to purchase additional electronic components.  He even told the Source how much passport photos cost and in which aisles to find the electronic components.  Finton also recommended at least two others to the UCE.  Surely, someone who was reluctant to partake in the criminal activity would not attempt to bring others into it.

Throughout the interaction, Finton expressed two conditions, to which he, himself, offered the solutions to overcome.  First, Finton did not want to commit a suicide bombing.

Instead, Finton explained that he wanted to be on the front lines because he wanted to commit more than one act. As Finton told the UCE, "I'm serious. It's just one of 'em. I got more things in sight."

Finton's second reservation related to attacks on civilians. Finton again overcame this objection, stating to the UCE "but anything, you know, military, political, that's a completely different ball game, you know, because it's the same, it's the same group of people." Similarly, Finton had told the Source that if someone was "gonna be attacking soldiers and politicians and generals, then, I'm his man." According to Finton, he did not want to attack the "easy target," like "the mall", but instead wanted to attack a government building, which Finton described as "a lot more worthwhile." From there, Finton turned the attack toward the FBI and the ultimate target, the Federal Building. But, according to Finton, if he got out of the country, he would not end his terrorist activities with the Federal Building. Instead, he intended to return in a couple of years because he wanted "to do it again." Eagerness to commit another similar act cannot, in anyway, demonstrate reluctance.

Finally, Finton's lack of reluctance was best shown on September 23, the morning of the attack. The Source asked Finton if he wanted to back out of the plan and return to Decatur; Finton replied, "I'm in the army now." Finton later contemplated his role,

> I'm technically the mastermind behind this whole thing because I planned this…They didn't go totally with my idea. I was in favor of the twin car bombing. That's what I wanted to do. I said, ya know, I really, really like the twin car bombin' idea. You put one, it goes off and it's gonna draw everybody in the fuckin' city right to that location, and then you set the other one off, takin' out half of Springfield police, all the FBI, all the rest of the FBI that weren't takin out with the first one are gonna get the second.

Finton's only reluctance was that the attack was not big enough.

20

#### e. Nature of the Inducement

The fifth factor, the nature of the inducement, also supports Finton's predisposition to attack the federal government. As a preliminary matter, because Finton was predisposed to commit the crimes, the Court need not reach the question of extraordinary inducement. *Hall*, 608 F.3d at 343; *Santiago-Godinez*, 12 F.3d at 728. Regardless, the nature of inducement in this case was not extraordinary given the efforts taken by Finton and the danger Finton was ready to encounter -- and did in fact encounter -- to attack the federal government.

The Seventh Circuit has previously stated that a person who takes advantage of an ordinary opportunity to commit a crime is not induced. Specifically:

> [a] person who takes advantage of an ordinary opportunity to commit criminal acts – not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person – is not entrapped. Such a person is predisposed to crime in the sense that the ordinary profits of crime are incentive enough to him to commit crimes; he is ready and waiting; all that is wanting is the opportunity.

*Evans*, 924 F.2d at 717; *see also Jacobson v. United States*, 503 U.S. 540, 550 (1992) ("[I]n a more elaborate 'sting' operation . . . where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition."). Absent some persistent inducement, the criminal undertaking itself is sufficient to satisfy predisposition. *Ellis*, 23 F.3d at 1272; *see also Millet*, 510 F.3d at 676-77.

Here, any evidence of government inducement is sparse. During their meetings, the UCE bought Finton's meals and occasionally a cup of coffee or tea. On May 6, the UCE gave Finton a cellular telephone with pre-paid minutes; the total cost was $269.36. Finton understood that

21

the phone was provided to him to simplify communications between the UCE and Finton. Prior to the July 29 meeting, the UCE added $110 worth of pre-paid minutes to Finton's cellular phone. At that meeting, the UCE reimbursed Finton for the electronic bomb parts and the cost of gas, giving Finton $95 for the parts, $30 for gas, and $10 for cigarettes. During the August 14 meeting, the UCE gave Finton $50 for gas and passport photos. In mid-August, the FBI, purportedly from the UCE, sent Finton $500 to help him pay his rent and added an additional $110 in pre-paid minutes to his phone. Finally, during the September 1 meeting, the UCE gave Finton $40 to cover his gas. Other than the meals, $500 for rent and $10 for cigarettes, the benefits to Finton merely reimbursed Finton's expenses associated with partaking in the criminal activity.

As this summary makes obvious, the government did little more than offer Finton the opportunity to join al Qaeda and conduct an attack. He jumped at the opportunity, showing no reluctance and requiring no government inducement. Consequently, unless Finton can proffer evidence that he was not predisposed to commit the crimes or that the government offered him some extraordinary inducement to commit the charged offenses, this Court should preclude Finton from raising an entrapment defense.

**B. Pretrial Adjudication of the Entrapment Question is Appropriate.**

The overwhelming facts of this case and the elements of an entrapment defense make this question ripe for pretrial determination. The defendant carries the burden to establish that he was not predisposed to commit the crimes and that a government actor induced him to commit them. Finton cannot show that he lacked the predisposition to commit the crimes or that there was any

22

extraordinary inducement.  Therefore, requiring the government to rebut this affirmative defense during its case in chief would unduly prolong the trial with otherwise unnecessary evidence.

The Supreme Court and Seventh Circuit Court of Appeals have opined that such a pre-trial determination does not infringe on the jury's province.  The Supreme Court has held that, prior to raising an affirmative defense at trial, a defendant must be able to proffer sufficient evidence that, if believed by the jury to be true, would qualify him for a jury instruction on that defense.  *United States v. Bailey*, 444 U.S. 394, 415 (1980).  "[P]recisely because a defendant is entitled to have the credibility of his testimony, or that of witnesses called on his behalf, judged by the jury, it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense."  *Id.*  The Court continued:

> The requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility. Nor is it based on any distrust of the jury's ability to separate fact from fiction. On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses. If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense.

*Id.* at 416.

While the issue of entrapment is generally one for the jury, "where the evidence proffered in response to a motion *in limine* . . . is insufficient as a matter of law to support an affirmative defense, a pretrial ruling precluding the presentation of the [entrapment] defense at trial may be appropriate."  *Santiago-Godinez*, 12 F.3d at 727.  "[T]here exists substantial legal authority to

support [a trial] court's decision to require a sufficient proffer or showing of entrapment evidence before such defense may be presented to the jury." *Blassingame,* 197 F.3d at 280.  This is one of those cases where it is appropriate for the Court to preclude the presentation of an entrapment defense prior to trial.

The parties and the Court need to know *before trial* whether an entrapment defense will be presented to the jury.  Otherwise, the government would have to disprove entrapment beyond a reasonable doubt, a burden that necessitates the government introducing voluminous recordings and other evidence concerning the defendant's predisposition to commit the charged crimes.  This evidence will greatly extend the trial.  But, if no entrapment defense is at issue, the government's evidence will consist of a more limited, relatively straightforward presentation of the defendant's conduct and statements relating directly to the charged offenses.  An appropriate result using a wholly appropriate device; the motion in limine.  *See United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002) (citing Santiago-Godinez and stating that "[m]otions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues").

## **Conclusion**

No evidence exists in this case to support the affirmative defense of entrapment, and a great deal of evidence shows the defendant's predisposition to commit the crimes.  Even when taken in the light most favorable to the defendant, the government's evidence provides no legitimate basis for the Court to find a lack of predisposition or an extraordinary government inducement.  The government merely offered the defendant an opportunity to commit a deadly,

24

large-scale attack against the United States' employees and property.  Such an offer can hardly be characterized as an inducement.  Indeed, such an offer only would appeal to a person predisposed to engage in such criminal conduct and not to an otherwise law-abiding citizen. Therefore, absent a proffer by the defendant of some other evidence, there is an insufficient basis, as a matter of law, for the Court to find that the defendant has met or could meet his threshold burden of proving an extraordinary government inducement.  This inadequate factual basis to support the defense renders a pretrial determination on the issue proper.

WHEREFORE, the United States respectfully requests that this Court (1) require the defendant to make a pretrial proffer or presentation of sufficient evidence to satisfy his threshold burden of proving a lack of predisposition to commit the charged crimes and an extraordinary inducement by the government to overcome that lack of predisposition, and, (2) if the defendant fails to meet that initial burden, enter a pretrial order prohibiting the defendant, absent some new evidence, from raising an entrapment defense at trial.

Respectfully submitted,
JAMES A. LEWIS
UNITED STATES ATTORNEY

Field Code Changed

/s/Eric I. Long

By:

Eric I. Long, IL Bar No. 6243382
Attorney for Plaintiff
United States Attorney's Office
318 South Sixth Street
Springfield, IL  62701
Telephone:  217-492-4450
Fax:  217-492-4888
Email:  eric.long@usdoj.gov

25

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 7, 2011, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification

of such filing to the following:

> J. William Lucco
> Clyde L. Kuehn
> Counsel for Michael C. Finton

> /s/ Eric I. Long
> _____
> Eric I. Long, IL Bar No. 6243382
> Attorney for Plaintiff
> United States Attorney's Office
> 318 South Sixth Street
> Springfield, IL  62701
> Telephone:  217-492-4450
> Fax:  217-492-4888
> Email:  eric.long@usdoj.gov

| Field Code Changed |
| --- |

26