**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

UNITED STATES OF AMERICA,     )
                              )
              Plaintiff,      )
                              )
     vs.                      ) No. 10-cr-30215-DRH
                              )
MICHAEL C. FINTON,            )
                              ) MAY 9, 2011
              Defendant.      )

**TRANSCRIPT OF PLEA and SENTENCING HEARING**
**BEFORE THE HONORABLE DAVID R. HERNDON**
**UNITED STATES DISTRICT JUDGE**

**<u>APPEARANCES</u>**

**FOR PLAINTIFF:**     Alamar Shabbir Hamdani, Esq.
                       U.S. Dept. of Justice
                       950 Pennsylvania, Room 2718
                       Washington, DC  20530

                       Eric I. Long, Esq.
                       U.S. Attorney's Office
                       318 S. Sixth Street
                       Springfield, IL  62701-1806

**FOR DEFENDANT:**     J. William Lucco, Esq.
                       Lucco, Brown, Dawson & Hertz
                       224 St. Louis Street
                       Edwardsville, IL  62025

                       Clyde L. Kuehn, Esq.
                       Mathis, Marifian & Richter
                       23 Public Square, Suite 300
                       Belleville, IL  62220

**REPORTED BY:**       Laura Esposito, RPR, CRR (Retired)
                       Official Court Reporter
                       U.S. District Court
                       750 Missouri Avenue
                       East St. Louis, IL  62201

   PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

*(The following proceedings were held in open court, with the defendant present, commencing at 3:10 p.m.)*

THE COURT:  Let the record reflect that we're in open court.  We've called the matter of *United States of America vs. Michael C. Finton, also known as Talib Islam*, Case Number 10-30215.

Government is present this afternoon and represented by Mr. Long and Mr. Hamdani.  Good afternoon, gentlemen.

MR. LONG:  Good afternoon, Your Honor.

THE COURT:  Defendant is present in court.  He's together with his counsel, Mr. Lucco and Mr. Kuehn.  Good afternoon, gentlemen.

MR. LUCCO:  Good afternoon, Your Honor.

MR. KUEHN:  Good afternoon, Judge.

THE COURT:  Good afternoon, Mr. Finton.

THE DEFENDANT:  Good afternoon, Judge.

THE COURT:  We've called this matter for the plea, and since we're -- and then we're also going to do a sentencing immediately thereafter.  So, at the defendant's request -- so we're going to be here and be talking about quite a number of things, so rather than have the defendant come up and stand that whole time, I'm just going to allow Mr. Finton, if he would like, to continue to sit at counsel table.

Is that your preference, Mr. Finton, or would you

*USA vs. Finton, Case #10-30215*          5/9/11 - Pg. 2
*Plea Hearing*

rather stand?

**THE DEFENDANT:**  I'll stay.

**THE COURT:**  Pardon me?

**THE DEFENDANT:**  I'll stay.

**THE COURT:**  That's great.  I do need you to stand initially though and be placed under oath.

**(Defendant  sworn by the clerk.)**

**THE COURT:**  So -- and make sure your seat is close enough to that microphone.  Maybe the lawyers can help you with both those things, making sure your microphone and your seat are close.

As I said, Mr. Finton, we've got quite a few things to talk about, and I want to establish some understanding between you and I as we begin this conversation.  The first part of this is that I don't want to go through this hearing and come to the end of it or have you leave the courtroom and say, *You know, I didn't understand what Judge Herndon was talking about when*, blah, blah, blah.  So I want to assure you that no one is in a hurry here.  And what is extraordinarily important is that, if at any time I talk about something you don't understand, you have a couple of options:  First, you're flanked by a couple lawyers, and you can certainly turn to either one of those gentlemen and ask them to explain either what we're doing here or what it is that I'm talking about -- and, as you know I think by now,

they're fully capable of explaining either of those things -- or you can simply direct your question to me. I'll be happy to explain what I'm doing or explain what I'm talking about, phrase it differently, anything I'm talking about. I just simply don't want you to have any level of discomfort about the procedure or what I'm talking about, and I want you to feel completely free to ask questions about those things. Will you do that for me?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** The other thing, I want you to make sure you understand -- I have a copy of the plea agreement that is signed, but up until the point in time in which you say that you plead guilty, your signature won't matter from the standpoint of me saying, *I accept your plea.* You can withdraw from this proceeding. You can say, *I want you to stop, I don't want to go any further, I want to go to trial.*

You're in control of whether or not we finish this hearing and proceed on completely and fully. If you decide you want to change your mind, that's up to you completely. I cannot take a plea from somebody who doesn't want to make a plea. Do you understand that concept?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** All right. So you have taken an oath, Mr. Finton, and that means that when I ask questions throughout this hearing, it's common sense, I think, and

common knowledge that a person that's under oath has to tell the truth. And the rule that we have in federal court requires that I make sure, first, you understand that, and secondly, I have to advise you that if you violate that law, you could actually be charged with another offense.

I think you understand that, don't you?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Okay. Now, for the record, I have to also ask you to tell us your full name.

**THE DEFENDANT:** Michael Curtis Finton.

**THE COURT:** And please tell me how old you are.

**THE DEFENDANT:** Thirty-one.

**THE COURT:** And what your actual date of birth was.

**THE DEFENDANT:** December 8th, 1979.

**THE COURT:** Now, Mr. Finton, even though I've been through the record pretty thoroughly, I need to establish for the record how far you went in school.

**THE DEFENDANT:** I almost have an Associate's degree.

**THE COURT:** And I know that you had an evaluation through -- this psychological or psychiatric evaluation through this process that we've been through since you've been charged in this case, and that's not what the rule requires me to ask you, but actual treatment for mental illness. You've not been treated recently; correct?

**THE DEFENDANT:** Correct.

*THE COURT:* And as you sit there today, and let's take the last 24 hours as a snapshot, have you taken any kind of medication?

*THE DEFENDANT:* No, Your Honor.

*THE COURT:* And, clearly, since you're in custody, I presume you've not had an alcoholic beverage to drink?

*THE DEFENDANT:* No, Your Honor.

*THE COURT:* As a matter of fact, from what I read in the record, you've given up the drinking of alcohol sometime ago, since you converted to Islam?

*THE DEFENDANT:* Yes, Your Honor.

*THE COURT:* All right. Now, there was an indictment handed down in this case quite sometime ago, Mr. Finton, and it was originally an indictment in two counts. And I know that your plea today is only going to involve the second count, but the indictment, as filed, was a two-count indictment. You recall that, sir?

*THE DEFENDANT:* Yes, Your Honor.

*THE COURT:* I suspect that you've taken the opportunity to read that indictment carefully and thoroughly and probably more than once?

*THE DEFENDANT:* Yes, Your Honor.

*THE COURT:* Would you characterize your knowledge of it as thorough, Mr. Finton?

*THE DEFENDANT:* Correct, Your Honor.

**THE COURT:** And you understand what you've been charged with, I presume?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** And the lawyers you have now are not your original lawyers, so -- but can I also presume that you've gone over the indictment with both Mr. Lucco and Mr. Kuehn?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Now, would you like me to -- since we're really only going to talk today about Count 2, would you like me to read that count here in open court word-for-word?

**THE DEFENDANT:** That's not necessary, sir.

**THE COURT:** Okay.  With respect to the work that Mr. Lucco and Mr. Kuehn have done on your behalf -- and I know that not everybody likes everything their lawyers tell them, and I'm not asking that question in particular.  But I'm asking if you're satisfied with their work product, what they've done for you, if you feel like they've been working in your best interest, if you're satisfied with your lawyers?

**THE DEFENDANT:** Very satisfied, sir.

**THE COURT:** Thank you.  Now, as I said, we're here because of a plea, and I've made reference to a plea agreement.  And I notice that there are some signatures on the last two pages of this plea agreement; they're pages 14 and 15.  On page 14, your lawyers signed and they dated the

date lines adjacent to their signatures with today's date. On the very last page there is your signature. You did not actually date it, but did you sign it today?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** All right. And then there's Mr. Long's signature on behalf of the United States, which he dated today.

Mr. Finton, I'm going to ask the clerk to walk this piece of paper over to you and have you confirm here in open court that this is actually your signature, sir. Is that your signature on that page 15?

**THE DEFENDANT:** Yes, it is, sir.

**THE COURT:** Mr. Finton, I'm just going to ask you also -- there's writing next to the right of your name. Your name is -- your signature is in English. To the right of that, is that Arabic or what?

**THE DEFENDANT:** Yes. That's my -- that's Talib Islam, sir.

**THE COURT:** I was incapable of reading it. I just wanted to make sure. I appreciate that.

So when you signed this, Mr. Finton, you were -- were you here in the courthouse or were you someplace else?

**THE DEFENDANT:** No. I was here in the courthouse, sir.

**THE COURT:** All right. Now, I'd also like to ask you,

Mr. Finton:  When was it you first saw a printed copy of this plea agreement?  Your best recollection.

**THE DEFENDANT:**  The final version?

**THE COURT:**  Yes.

**THE DEFENDANT:**  I believe today.

**THE COURT:**  When was it then that you saw some other iteration of the agreement, some prior version of the agreement?

**THE DEFENDANT:**  Would that be -- are you referring to the one, the offer Mr. Scherschligt did?

**THE COURT:**  I'm talking about some prior version of this agreement.

**THE DEFENDANT:**  Okay.  Couple of weeks ago.  I mean --

**THE COURT:**  All right.  And in the last two weeks were there major changes in the agreement or were they fairly minor?  How would you characterize the changes?

**THE DEFENDANT:**  About halfway.

**THE COURT:**  All right.  So you would -- would it be fair to characterize this plea agreement as a process?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  A give-and-take between the government, your lawyers.  And they worked back and forth to come up with something that ultimately you felt to be to your satisfaction?

**THE DEFENDANT:**  For the most part, yes.

**THE COURT:** You alluded to something I wanted to bring up. Some months ago I went to Springfield and there was at least some suggestion that maybe you were going to plead at that time. Is that a fair characterization?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** But is it also fair to say you had some discomfort with your legal counsel at that point?

**THE DEFENDANT:** There was some indication -- let me correct what I said. There was some -- at one point I wanted to, but I really didn't want to plead to that one, which is why I didn't.

**THE COURT:** And is it fair for me to say there was just something that you really felt you needed to be satisfied with about your defense that you just -- that was just so strong a feeling that you just couldn't bring yourself to agree at that point in time?

**THE DEFENDANT:** Yes. I would say that's right.

**THE COURT:** All right. Would you like to describe it in some other way?

**THE DEFENDANT:** It struck me as a trick.

**THE COURT:** Okay. Fair enough. And so at that point in time you asked me for new lawyers or different lawyers?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And that's when we kind of came to some agreement, and I added Mr. Lucco to your defense team. Is

that a fair assessment?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  And it wasn't long after that that your first set of lawyers dropped off the defense team?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  And that's when I added Mr. Kuehn?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  And I'm going to characterize it as, since that time there has been a huge amount of work done in your case by your defense team?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  You agree with that completely?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  All right.  Is it fair, Mr. Finton, for me to assume that since that time, since the new lawyers have taken over, that you have become a lot more comfortable with the approach that your defense has taken in this case?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  And it's much different than that feeling you had back when I traveled to Springfield and there was some discussion about whether you would plead or not plead?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Are you in a place now, Mr. Finton, where it's just -- you're just a lot more comfortable with what's going on in your case?

**THE DEFENDANT:**  Can I talk to my attorney?

**THE COURT:**  Oh, absolutely.

*(Off-the-record discussion between the defendant and his counsel.)*

**THE DEFENDANT:**  I've never really felt comfortable about it, sir, about this case.

**THE COURT:**  Well, describe for me in your own words where you are right now and why it is you've decided to come in and plead guilty.

**THE DEFENDANT:**  Well, it's weighing my options.  It's seeing what's best, considering I'm going to be the one that's doing the time.  I mean I wouldn't -- if I really, really didn't want to do it, I wouldn't be here; I'd be preparing for trial.  It's just that I feel -- to be perfectly honest and perfectly blunt, I feel that with the way things are right now, how I see my case going, isn't exactly an option.

**THE COURT:**  You mean trial is not an option?

**THE DEFENDANT:**  Yes.

**THE COURT:**  Let me -- maybe the best phrase, trial is not the best option?

**THE DEFENDANT:**  Trial's not the best option.

**THE COURT:**  Trial's always an option; it's just that it's not best option for you given the circumstances of the case?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Got you.  And I should have prefaced my prior remark with -- because "comfortable" is kind of a strange word to use when you're pleading guilty and about to do a number of years in prison.  But in terms of where you are, you see this as your best option?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Got you.  Now, the plea agreement that has been tendered to the Court, does this represent your entire agreement with the government?

**THE DEFENDANT:**  Yes, it does, sir.

**THE COURT:**  And when I talk about that, of course, what I really mean is, nobody's made any unwritten promises to you; nobody's said, *Look, we're not going to put this in writing, but if you'll sign this and go to the judge with this, then we'll make sure that this happens or that happens*?

**THE DEFENDANT:**  Correct, sir.

**THE COURT:**  Now, even though you just saw the final version of your plea agreement today, did you go over it with your lawyers?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Did you yourself read this plea agreement thoroughly?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  And carefully?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  By the time you signed it, did you feel as though you were thoroughly familiar with it?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  And did you understand everything contained within the agreement?

**THE DEFENDANT:**  I believe so, sir.

**THE COURT:**  Now, Mr. Finton, did anybody -- and I use that term as broadly as you can possibly imagine.  Did anybody in any way threaten you to try to get you to sign this agreement?

**THE DEFENDANT:**  No.  No, sir.

**THE COURT:**  In this agreement -- and I'd like to go through some of it with you.

First of all, this is an agreement that requires something of me.  If I do not agree to the terms of the agreement, then I must give you notice and allow you to withdraw from the agreement.  You understand that?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  The agreement contains an appeal waiver; says that if you go through with this, there's no appealing your conviction or your sentence.  You can't -- in our district, we're within what's called the Seventh Circuit. You can't appeal to the Seventh Circuit and say, *You know, I*

*know I agreed to that, to plead guilty, and I agreed to be sentenced, but I've changed my mind, I want to appeal.* You understand that?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Then there's a waiver of what's called a right to a collateral attack. Now, under 28 United States Code, Section 2255, as to the sentence itself and whether or not certain of your rights were accorded with respect to how you were sentenced, you give up the right to collaterally attack or try to vacate the sentence relating to your plea and your sentence. You understand that?

**THE DEFENDANT:** Yes, sir. I have quick question.

**THE COURT:** Sure.

**THE DEFENDANT:** I'm more familiar with the State of Illinois laws. And is -- the 2255, from what I understand, is the habeas corpus; correct?

**THE COURT:** Federal version of habeas corpus for the federal.

**THE DEFENDANT:** In the State of Illinois they have a post-conviction motion. Is that the same thing?

**THE COURT:** Basically the same thing.

**THE DEFENDANT:** Okay.

**THE COURT:** It talks about the fact that I may calculate your Sentencing Guideline, which I will during the sentencing phase. And, once again, if I reject your plea

agreement, I have to give you notice and allow you to withdraw your plea, which, of course, the law requires of me.

There's a part on page 7, it talks about your obligations with respect to the confidential sources in this case. Do you fully understand that part and the effect on you if you were to violate this agreement?

**THE DEFENDANT:** I believe I do, sir.

**THE COURT:** What would happen if you were to violate the agreement, Mr. Finton?

**THE DEFENDANT:** I would face Count 1 in the -- I would face Count 1 in the indictment, face trial. If convicted, probably most likely get 20 years consecutive.

**THE COURT:** Okay. Now, the United States, it goes on to say, agrees to dismiss Count 1 if this agreement goes through. And you understand that?

**THE DEFENDANT:** Yes.

**THE COURT:** I took it by what you said just a moment ago. There's then a factual basis that's set out, which I take it, since you signed this agreement, you have no quarrel with the factual basis that they've printed up in this plea agreement?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Clearly, I didn't go through the plea agreement word-for-word or paragraph-by-paragraph. I just

highlighted some things I wanted to make sure that you were clear on.  But having gone through that brief exercise, did it provoke any other questions for you, Mr. Finton, for me or your lawyers?

**THE DEFENDANT:**  No, sir.

**THE COURT:**  A similar question to the one I asked before relative to your plea agreement.  This has to do with your plea itself, Mr. Finton.  And, once again, I mean this in a broadest possible way.  Has anyone attempted in any way to force you to plead guilty in this case?

**THE DEFENDANT:**  No, sir.

**THE COURT:**  Has anyone threatened you in any way to get you to plead guilty in this case?

**THE DEFENDANT:**  No, sir.

**THE COURT:**  And, again, this is outside the plea agreement, but has anyone made any promises to you -- and I'm not talking about the plea agreement -- promises or assurances to you in any way to get you to plead guilty -- to, yeah, plead guilty in this case?

**THE DEFENDANT:**  No, sir.

**THE COURT:**  Mr. Finton, are you pleading guilty of your own free will because you know that you are guilty?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Now, the offense that is charged in Count 2 of this indictment is a felony offense.  If I accept your

plea, you'll then be adjudged guilty of the offense contained in Count 2, which means you may well be deprived of certain valuable civil rights, like the right to vote, hold public office, serve on a jury, and possess any kind of firearm.  You understand that?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  So, once again, the rule requires -- and I keep mentioning that, but a plea in federal court is driven largely by what the rule requires, and then some of it by common sense, but the rule sets out a lot of what we do.

So the rule requires that I talk to you about the maximum possible penalties.  So, for Count 2, the maximum possible penalty is life in prison, up to a quarter million dollar fine, up to five years of supervised release, and a $100 special assessment.  You understand those things?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  In order to prove a legal case, if you will, or a submissible case to a jury for the charges in Count 2, the government must prove, beyond a reasonable doubt -- and these things, by the way, I meant to say a moment ago, are printed on page 3 of your plea agreement.

The government must prove, beyond a reasonable doubt, first, that you attempted to use a weapon of mass destruction, namely an explosive bomb; secondly, that the attempted use of that bomb was against property owned or

used by the United States; and, third, that you did so without lawful authority. And you understand that's what the government must prove?

THE DEFENDANT: Yes, sir.

THE COURT: Do you believe, Mr. Finton, that you understand all of the possible consequences of entering into a plea in this case?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Finton, there is no parole in the federal system. That's been abolished a number of years ago. If you're convicted in this case and sentenced to prison, you do the time you're sentenced, except, of course, there is, within the Federal Bureau of Prisons, a good time credit system. That's an administrative process operated by the prison system that has nothing to do with the court process. But it's not a parole process; it's simply good time credit process. There's no parole. And you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: This is set out to some degree as well in your plea agreement, but I need to advise you of your rights. And so let me go through these constitutional rights with you, Mr. Finton.

You do have the right to plead not guilty to any offense charged against you and to persist in that plea.

You have the right to a trial by jury.  At trial you would be presumed innocent and the government would have to prove your guilt beyond a reasonable doubt.  You have the right to the assistance of counsel for your defense, appointed by the Court, if necessary, at trial and every other stage of the proceeding; the right to see and hear all the witnesses and have them cross-examined in your defense; the right on your own part to decline to testify, unless you voluntarily elected to do so in your own defense; the right to compel the attendance of witnesses to testify in your defense.

And if you were to go to trial and not testify or put on any evidence whatsoever, those facts could not be used against you.  If you did go to trial, and the jury found you guilty, you'd have the unrestricted right to appeal that jury verdict.  Do you understand you have all of those rights, Mr. Finton?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Do you further understand though that, by entering a plea of guilty, if that plea's accepted by the Court, there will be no trial.  You will have waived or given up your rights associated with a trial, which I've just described.  Do you understand that, sir?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Mr. Finton, going back to what we first talked about as I began this process, is there anything that

we've talked about, other than the couple questions that you did ask, but is there anything at all that we've talked about that you have not understood, that you want to -- or any process or any procedure that you want to ask your counsel about or ask me about?

**THE DEFENDANT:**  Just one question.

**THE COURT:**  Absolutely, sir.

*(Off-the-record discussion between defendant and his counsel.)*

**THE COURT:**  Anything you want to -- anything else you want to ask about?

**THE DEFENDANT:**  No, sir.

**THE COURT:**  And any of your questions -- I mean any of your answers to my questions, Mr. Finton, that you have given that you're not satisfied with, would you like to change in any way, add something to, take something away? Any changes in any of your answers?

**THE DEFENDANT:**  No, sir.

**THE COURT:**  Very well.  And, Mr. Finton, do you have any change of heart?  Would you like to stop this proceeding?  Would you like to go forward with your plea at this time?

**THE DEFENDANT:**  No, sir.

**THE COURT:**  You would not like to go forward with the plea?

**THE DEFENDANT:**  No, no.  I mean I don't want to change.

**THE COURT:**  I forgot my own question.  So then the question that I have, Mr. Finton, of you is:  How do you plead to the charge contained in Count 2 of the indictment, guilty or not guilty?

**THE DEFENDANT:**  Guilty, sir.

**THE COURT:**  It's the finding of the Court, in the case of *United States of America vs. Michael C. Finton*, that the defendant's fully capable and competent of entering an informed plea.  Defendant's aware of the nature of the charges and the consequences of the plea.  The plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense.  The plea is accepted.  The defendant's now adjudged guilty of the offense.

And, as I understand it, Mr. Lucco, your client does not wish to have a Pre-Sentence Report prepared, and wishes to go forward with the sentencing at this time?

**MR. LUCCO:**  That's correct, Your Honor.

**THE COURT:**  And, so, at the defendant's request, we will proceed with sentencing.

The Court -- even though the Court is prepared to accept the agreement in this case, it is the -- the Court is going to proceed with making a finding relative to the

sentencing guidelines so that the Court knows -- so the Court can make a record that the Court has gone through the guidelines in preparation for this hearing and has made a determination vis-a-vis the guidelines, because the Supreme Court directs the Court, any time the Court considers a sentence, to consider the sentencing guidelines, the advice of the Commission, and then considers the positions of the parties before making a determination relative to the sentence.

In preparation for this case I have been able to consider the record in the case.  I have been able to consider the defendant's criminal history and consider the reasons for the plea agreement as I have been able to glean from the plea agreement.

So, in determining the sentence, or the advice of the Sentencing Commission, one must utilize the 2010 manual of the Sentencing Commission for a sentence under or pursuant to 18 United States Code, Section 2332(a), which is the criminal offense for which Mr. Finton was convicted.

Section 2M6.1 is the operative section.  That section applies to unlawful activity involving nuclear material, weapons, or facilities, biological agents, toxins, or delivery systems, chemical weapons or -- here's the operative language, "other weapons of mass destruction," attempt or conspiracy.  And it's the "other weapons of mass

destruction" and attempt that is really applicable to this case.

So, subsection (a)(1) provides for a base offense level of a 42, if the offense was committed with intent to injure the United States.  And, here, the defendant has pled guilty to an attempt to destroy property of the United States.  In addition, the base offense level -- it's clear that the courthouse and congressman's office were occupied with government officials, and there was, by a preponderance of the evidence, a clear intent that those occupants be victims.  So, under 3A1.2, three levels are added.

Since the victims provided motivation, at least in part, for the defendant's actions, and the base offense level originates from Chapter 2, six levels are added to the base offense level.

There's another specific offense characteristic that applies, and that's under 3A1.4, since the offense was designed to promote an act of terrorism, so an additional 12 offense levels are added.  So, the adjusted offense level is a 63.

Defendant accepted his responsibility here this afternoon, so there's a reduction of two levels for that acceptance of responsibility.  In light of the fact that this is an 11(c)(1)(C) disposition, I give him credit for

the third level off as well, without even asking Mr. Long if he moves for that third level.  I assume he would.

So, the total offense level is a 60, but the guideline levels do not go any higher than a 43, so the total effective -- the effective total offense level is a 43.

Defendant's criminal history is comprised of a single case in Richland County, 99-CF-11, which was -- different counts -- aggravated robbery and aggravated battery with great bodily harm.  That conviction came in July 2009, just a little over ten years before the instant offense, but less than 15 years, and the defendant was sentenced to concurrent sentences of 12 and 4 years, and was paroled in May of 2006. So the criminal history point score is a 3, which ordinarily would garner a criminal history category 2, but since Section 3A1.4 is applied, subsection (b) of that section calls for an automatic criminal history category 6.

So, with a total offense level of 43, and a criminal history category 6, the Commission's advice is life in prison.

Even though the advice is life, the Commission still renders advice regarding supervision, which is three to five years; probation's not available; fine range is 25,000 to 250,000; special assessment is $100.

The defendant's exposure under the statute, 18 United States Code Section 2332(a), is up to life in prison;

probation not available; not more than 250,000 in fine; not more than five years supervised release; special assessment $100.

Mr. Long, do you think I calculated the guideline correctly?

**MR. LONG:**  I do, Your Honor.

**THE COURT:**  And, Mr. Lucco, did you have any differences in the guideline calculation?

**MR. LUCCO:**  I do not, your Honor.

**THE COURT:**  Okay.  So the plea agreement calls for a 28-year sentence and a five-year term of supervised release.  It does not -- it is silent as to a fine, and, of course, there's -- it notes the obligation to pay the $100 special assessment.

Mr. Long or Mr. Hamdani, do you want to address the Court with respect to the disposition?

**MR. LONG:**  No, Your Honor.  I think the 28 years is reasonable in light of the particular circumstances of this case.  There's no fine or other restitution provisions in the agreement simply because of the inability to pay.

**THE COURT:**  And Mr. Lucco, or Mr. Kuehn?

**MR. LUCCO:**  Well, I might say, Your Honor, this has been an arduous task for Mr. Kuehn and I and our client to get from where we were last fall to today.  And I can't imagine that we, either of us, would be happy with a client

getting 28 years. Understand that Mr. Kuehn and my happiness is not an objective of this process. I say that seriously, and -- but I can say that there were many sort of analytical forks in the road in this case, our representation, where, to our benefit and I think to his own, Talib was able to understand things to a depth that's very uncommon in my experience. This is the kind of matter, kind of esoteric legal questions on entrapment for which, not only did Mr. Kuehn provide Talib with an in-depth memorandum, but we gave him all of the cases, and he read them, and he understood them and asked questions about them to an extent that I've had lawyers not ask or understand. He truly had an understanding and a grasp and appreciation, I think, for the law that had bearing on his decision here today.

This has just not been easy getting to this point for us professionally as lawyers. And I can also say that throughout the process, when you see charges this serious, you might think that we'd have a really difficult client, and that just was not the case. He's been forthright, cooperative, and helpful, genuinely helpful to us since day one. So I can only commend to the Court that his behavior since we've come to know him has been exemplary in terms of being a client, and that makes this heavy sentence today all the more difficult for us.

But we are here today, and I think we're at the best place we believed we were going to be.  So I know a nominal fine can have some consequence to the defendant, and that's -- even though the ability to pay is difficult, that's agreeable because, hopefully, he'll be able to work there.  He wants to do so.  He's always been a hard worker.

And lastly, Your Honor, we would ask the Court, in considering the sentence, to recommend that he serve his time in Greenville.  We have done calculations ourselves on the Bureau of Prisons score card, so to speak, and believe he can qualify and should qualify for Greenville, all public safety factors being taken into account.  I realize that's a Bureau of Prisons decision, but we want to ask Your Honor at the end of the day to make such a recommendation.

Lastly, I'll say that our client has written his own allocution, and he shared that with us, and we've made virtually no significant edits to it.  And it's a lot longwinded that I'm being now.  So it's meaningful to him, and some meaningful things I believe are said, so I can't -- I really won't be able to improve on that.

Thank you, Judge.

**THE COURT:**  Mr. Finton, I'm happy to provide you with the opportunity to talk to me before I impose sentence.

**MR. KUEHN:**  Your Honor, could I speak just briefly?

**THE COURT:**  I apologize, Mr. Kuehn.  Absolutely.

**MR. KUEHN:**  The name Talib Islam really, in Arabic, is "student of Islam".  Talib means "student."

And I would just second Mr. Lucco's statement about the type of client Talib was.  He picked up on a lot of the things that were involved in this case.  His decision is not one that was an easy one for him.  This case had a lot of moving parts.  This was a relentless investigation, undercover investigation, by the government that started as early as July of 2007, and wasn't completed until September of 2009.  I've listened to every one of the tape recorded statements.  There are many.  And the way they put together the case, it came down as a bottom line to us, realizing that it would be extremely difficult to let Talib go on the defense of entrapment, and that has to do with the type of investigation that was done that led him to that point, pushing what he thought were buttons to a bomb.

But all that being said, he's been a very good client.  He's one that I like.  I wish we could have done better for him.  I wish the government would have been more lenient, just a little more lenient, but that's the way it is.

And that being said, Your Honor, I hope that you can see fit -- we think he qualifies for medium security, and if you could recommend medium security for him.  That would be a very positive thing for him because he is a student.  Ever since he converted to Muslim, I don't think he's been

anything but a model prisoner.  And to this day I don't understand how the government was able to get him to where they got him in this investigation because he's not the type of person, in my mind, having dealt with him, that could really bring himself to have to do the horrible kind of crime his is charged with.

**THE COURT:**  Thanks, Mr. Kuehn.  So -- I'm sorry.

**MR. LONG:**  Your Honor, before you move on to actually imposing a sentence, I just want to bring the Court's attention to Rule 32(c)(1)(A)(2), which requires an actual finding that you have sufficient information in the record to impose a sentence without the Pre-Sentence Report.  So before we move too far along, I just wanted to point that out.

**THE COURT:**  I appreciate it.

**MR. LONG:**  Thank you, Your Honor.

**THE COURT:**  And, Mr. Finton?

**THE DEFENDANT:**  I bear witness that there is no being worthy of worship except God.

**THE COURT:**  You're going to have to slow down.  My court reporter's good, but not that good.

**THE DEFENDANT:**  I'm a little nervous.  Excuse me.

**THE COURT:**  I understand.

**THE DEFENDANT:**  I bear witness that there is no being worthy of worship except God, who is one and has no

partners, and I also bear witness that Muhammad --

**THE COURT:**  Still a little fast.

**THE DEFENDANT:**  Thinking about this moment made it very difficult to figure out what I wanted to say exactly because there was just so much I wanted to say that it gets kind of jumbled up.  I will try to keep things on subject and keep from rambling, as I sometimes do.  I hesitate also because I see this as almost a "Dear America" moment for me when it comes to, not just my case, but myself and this entire conflict.  Certain assumptions are made and arguments put forward that are just accepted as facts by the overwhelming majority of Americans.  So before I go any further, let me clarify a few things about myself while I have a chance.

Yes, obviously, I am a Muslim.  However, I was not raised in the Muslim World or even in a Muslim family.  I became a Muslim of my own free will in August of 2005 after intense study on my part.  I believe the Quran to be the unadulterated, infallible word of God.  I believe that Islam is a religion of Abraham and all the prophets, peace be upon them all, and its relationship is identical to that between Christianity and Judaism.

I believe that loyalty to the Quran, Sunnah, and the Muslims is incumbent upon and mandatory for Muslims, and that betrayal of that trust constitutes High Treason and

puts the guilty Muslim outside the pale and fold of Islam. I also believe that submitting one's will to God is the only path to salvation and paradise after death.

However, coming to believe these things did not magically transform me into a freedom-hating, anti-democracy, foaming-at-the-mouth lunatic.

I first read and understand the Declaration of Independence at a very early age. I can honestly say that the philosophies enshrined in that document are, in my mind, just as valid today as they were in 1776. I firmly believed these things before I became a Muslim, and I have found nothing in my studies of my chosen faith that even comes close to contradicting it. As a matter of fact, it confirms it and expands on it.

I believe now, and always will, that we have a creator. Our creator endowed all persons with certain inalienable rights. Among these are life, liberty, the pursuit of happiness, and personal property. It is the sole responsibility of the government to safeguard these rights. And, in fact, this is why governments are instituted among men. I also believe that if a government fails to safeguard these rights, the people must use all necessary measures to force them to. If the American people didn't agree, we wouldn't still have a Second Amendment, as an "armed and dangerous" population was and is the only safeguard against

foreign and domestic tyranny.

But somewhere along the way America seems to have forgotten these truths.  She now seeks to be atheistic in nature, thus denying her creator.  Ergo, if the government can convince the people there is no "real" God, you must then admit that the government gave you your now alienable rights and that she can take them away any time she sees fit.

As the famous Daniel Webster said, "It is the same whether our rights are taken away piecemeal or some tyrant comes and takes them away wholesale.  Either way, they are gone."  Furthermore, once they're gone, they're gone.

They'll tell you that only for the duration of the "war on terror" will they take your rights.  Like so many tyrants before, they seek to convince you that when the war is over, they will give back these emergency powers.  Yet, the architects of this war also said this war will never end.  And realize, it cannot end, as it is not a war on a person, a group, or a country, but on a concept and a tactic.

Does this not tell you, oh, America, that this is not a temporary state of affairs for you, but a new reality?  In fact, it is a new vision for your society, one in which you are the enemy.

Sure, they try and convince you that it is the Muslims

fighting to take away your rights, that it is the Muslims that are the real enemies of your freedom.  But I ask you: Is it the Muslims that amass powers for themselves not intended to be given by the Founding Fathers, or is it your own Congress?  Is it Muslims who wrote and passed the seriously misnamed "Patriot Act"?  Is it Muslims that forced the highly ineffective body scanners on the American masses, and then goes to work for the company that sells them?  Is it Muslims that are molesting your women and children after virtually strip-searching them in the airport?  Would that be Muslims who are doing these things (just to name a few) or are Muslims only the excuse?

At this time I would like to quote from a very important Supreme Court case, *Dennis vs. the United States*, from 1951:  As there are many talking heads that would, oh, so foolishly attempt to link Muslims with godless communists, the quotation is highly apt.  Discussing the struggle between freedom and national security, Mr. Justice Frankfurter so presciently said.

In the context of this deeper struggle, another voice has indicated the limitations of what we decide today.  No one is better equipped than George F. Kennan to speak on the menace of communism and the spirit in which we should meet it.

If our handling of the problem of communists in our

midst is not carefully moderated, if we permit it, that is, to become an emotional preoccupation and to blind us to the more important tasks before us, we can do damage to our national purpose beyond comparison to greater than anything that threatens us from the communist side.  The American Communist Party is today, by and large, an external danger. It represents a tiny minority in our country.  It has no real contact with the feelings of the mass of our people, and its position as the agency of a hostile foreign power is clearly recognized by the overwhelming mass of our citizens.

But the subjective emotional stresses and temptations to which we are exposed in our attempt to deal with this domestic problem are not an external danger; they represent a danger within ourselves, a danger that something may occur in our own minds and souls that will make us no longer like the persons by whose efforts this republic was founded and held together, but rather like the representatives of that very power we are trying to combat:  Intolerant, secretive, suspicious, cruel, and terrified of internal dissension because we have lost our own belief in ourselves and the power of our ideals.  The worst thing that our communists could do to us, and thing we have most to fear from our activities is that we should become like them.

That our country is beset with external dangers I readily concede.  But these dangers, at their worst, are

ones of physical destruction, of the disruption of our world security, of expense and inconvenience and sacrifice.  These are serious and sometimes terrible things, but they are all things that we can take and still remain Americans.

The internal danger is of a different order. America's not just a territory and a people.  There is lots of territory elsewhere, and there are lots of people, but it does not add up to America.  America's something in our minds and our habits of outlook which cause us to believe certain things and behave in certain ways, and by which, in its totality, we hold ourselves as distinguished from others.  If that once goes there will be no America to defend.  And that can go too easily if we yield to the human instinct to escape frustrations into the realm of mass emotion and hatred, and to find scapegoats for our difficulties in individualized fellow citizens who are, or have at one time, been disoriented or confused.  Or, to put it another way, "A people who would trade liberty for security deserve neither liberty nor security." Benjamin Franklin.

When one meditates a little on the "internal danger" that Mr. Kennan and Frankfurter spoke of, one sees that this is not a problem that disappeared with the Berlin Wall and the Soviet Union.  I believe we must be even more vigilant lest we lose our "own beliefs in ourselves and in the power

of our ideals."

Just look at what they are doing to you, America, and then look at the rights they are taking and the power they are amassing.  They want to listen to phone calls, read mail, follow all internet traffic, and track the people, all without a warrant.  They want the right to legalize the use of torture; then use information gained through the use of torture against people in tribunals and hearings.  They want the power to hold people without charges, lawyers, or warrant, permanently.  And if one looks at certain prominent cases in Texas, Oregon, Illinois, Michigan, and Maryland, they also want the power to use Agents Provocateurs to recruit and arm people so they can fabricate successes on the war on terror.

I am told that I should not delve too deeply into how the government handled my investigation and arrest, but I cannot help it.  I do get angry when I see my country modeling itself after communists and fascists.  It is even more irritating and maddening that it is being done based upon a pack of lies.  They persistently lie about Islam and Muslims in their effort to demonize us and make us into the new boogie men.

Perhaps, some are wondering why I, an "Islamic Fundamentalist," is speaking about such things as freedom, democracy, the Declaration of Independence, and liberty vs.

security, and taking the tone I am taking.  The lazy mind might come up with one of two answers:  That I don't really believe in the things I've said, and I am only posturing for the court.  But I would remind you that I'm taking a fixed deal, and no one is arguing for a lower or a higher sentence.

Or, two, one might say that perhaps I do believe the things I've said, in which case I'm a "bad Muslim" because everybody knows that Islam and Muslims are anti-freedom, anti-democracy, anti-everything-good-in-the-world, and the paragons of civil rights.  I say, save those nonsensical platitudes for talk radio and Tea Party conventions because they are just that, nonsense.

Let me elaborate on a little known but highly relevant fact.  Islam and America have a long history together stretching back over 200 years.  The first country to recognize the independence of the United States was not France, Czarist Russia, Germany, Spain, and certainly not England, but the King of Morocco, a Muslim state. Thomas Jefferson had a Quran.  In fact, Representative Keith Ellison from Minnesota was sworn in on it.  If one looks at the public and private writings of this nation's founders it is abundantly clear that they had a negative view of Christianity and a positive view of Islam.  In the government's view, Muslims were teetotalers, believed in God

and in the Final Judgment and, therefore, made good citizens, and for those reasons desired to increase Muslim immigration to the United States.  Chesterfield County Virginia wrote a letter to the federal government in the 18th century desiring this very thing for those very reasons.  The first written constitution in history was not the Magna Carta, but that of the Muslim State in the 7th century, dictated by the Prophet Muhammad.  The first thing in that constitution and its main aspect was religious freedom for Jews, Christians, and Muslims.  The first case of a refusal to prosecute a case due to improper means of evidence-gathering was made under the second Khalifah Umar al-Khattab, also in the 7th century.

So, far from there being some conflict between Islam and America's founding values, actually the opposite is true.  They complement each other beautifully.  It is America who was known for the slogan of freedom, personal responsibility, and the power to the people.  These are very Islamic ideas.  And, for the record, post-1979 Iran, with its secret police, and the Taliban with its war on women are not examples of Islamic government just because they are composed of Muslims who use Islamic slogans.  Rather, a near perfect example would be Muslim Spain.

Also, for the last ten years there are people who would say that America is a Christian nation, and like other

Christian nations, it is her duty to wage a Holy War against us in an effort to put down the infidel and prevent the Muslims from gaining power and eventually retaking the Holy Land.

However, in the Treaty of Tripoli that was signed between the U.S. and Muslims (which, by the way, was ratified by 100% of Congress and signed by the President, which makes it the law of the land) in Article II, America states specifically that America is not, nor ever has been, a Christian nation, and therefore, there is not anything in her that would make her automatically hostile to the Muslims.

While I do agree with the stated goals of most Muslims, being the ending of foreign domination on Muslim lands, freedom and justice for Palestinians, and the reunification of Muslim countries, I unequivocally and without reservation oppose the methods of some Muslims to achieve these goals.

I would like to take the time now and state very, very clearly that I am glad and I thank God that bomb was fake. At least this way, I do not have to stand in front of the Lord of the Worlds and answer for the deaths of innocent men, women, and children. For had I turned on the television or picked up a newspaper and saw a picture like the one in Oklahoma City where the fireman was carrying a

dead little girl, and knew that I had done those things, I would have killed myself.  For in any law, including the laws of Islam, there is no excuse for the direct targeting of innocent civilians.

So, to any residents of Springfield, Illinois and anyone who was there that day, I apologize, and I'm very, very sorry.

Thank you for your time.

**THE COURT:**  Thank you, Mr. Finton.

Mr. Long, any remarks from the government?

**MR. LONG:**  No, Your Honor.

**THE COURT:**  The Court then, having considered all the information in the record, which was sufficient without a Pre-Sentence Report, including guideline computations and the factors set forth in 3553(a), and the Court having fully considered all these matters, fully realizing that the Court had discretion to reject the plea agreement if it had chosen and imposed -- and given Mr. Finton the opportunity to withdraw his guilty plea, but pursuant to the Sentencing Reform Act of 1984, it's the judgment of the Court that the defendant, Michael C. Finton, also known as Talib Islam, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 336 months, the equivalent of the agreed upon 28-year sentence.

It's ordered that defendant shall pay the

United States a special assessment of $100, payable through the clerk of the United States District Court.  It's further ordered defendant shall pay the United States a total fine of $1,000, which is a stark departure from the fine called for by the application of the guidelines.  Fine is due immediately.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of five years. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the United States Probation Office in the district to which the defendant is released.  While on supervised release the defendant shall not commit a federal, state, or local crime, and shall comply with the standard conditions that have been adopted by the Court and which will be contained within the written judgment of the Court.

Defendant shall refrain from any unlawful use of a controlled substance.  Defendant shall submit to one drug test within 15 days after being released on supervision and at least two periodic dug tests thereafter, not to exceed 52 tests in a one-year period.  Defendant shall not possess a firearm or destructive device.  Defendant shall cooperate in the collection of DNA as directed by the probation officer, and shall comply with the following special conditions:  Pay any financial penalty that is imposed by this judgment and

that remains unpaid at the commencement of the term of supervised release.  Having assessed the defendant's ability to pay, payment of the total criminal monetary penalty shall be paid in equal monthly installments of $25, or 10 percent of his net monthly income, whichever's greater, over a period of 44 months, to commence 30 days after release from imprisonment to a term of supervision.

Due to the defendant's substance abuse history, Mr. Finton shall participate, as directed and approved by the probation officer, in treatment for narcotic addiction, drug dependence, or alcohol dependence, which includes urinalysis or other drug detection measures and which may require residence and/or participation in a residential treatment facility.  The number of drug tests shall not exceed 52 tests in a one-year period.  Any participation will require complete abstinence from all alcoholic beverages.  Defendant shall pay for the costs associated with substance abuse counseling and/or testing based on a co-pay sliding fee scale as directed by the United States Probation Office.  Co-pay shall never exceed the total cost of counseling.

Due to the nature of this offense, defendant shall submit his person, residence, real property, place of business, computer, electronic communication and/or data storage device or media, vehicle, any other property under

his control to a search conducted by the United States Probation Office and such other law enforcement personnel as the probation officer may deem advisable, and at the direction of the United States probation officer at a reasonable time and in a reasonable manner based only upon reasonable suspicion of contraband or evidence of a violation of a condition of release without a warrant. Failure to submit so such a search may be grounds for revocation. The defendant shall inform any other residents that the premises and other property under the defendant's control may be subject to a search pursuant to this condition.

Defendant shall provide the probation officer and the Financial Litigation Unit of the United States Attorney's office with access to requested financial information. Defendant is advised that the probation office may share financial information with the Financial Litigation Unit. Defendant shall apply all monies received from income tax refunds, lottery winnings, judgments, and any other anticipated or unexpected financial gains to the Court-ordered financial obligation. Defendant shall immediately notify the probation officer of the receipt of any indicated monies.

The sentence in this case is outside the advisory guideline system, imposed pursuant to the binding plea

agreement and in accordance with Rule 11(c)(1)(C), and accepted by the Court, set out within the agreement was sound.

Mr. Finton, you can appeal your conviction if you believe your guilty plea was unlawful or involuntary or if there's some other fundamental defect in the proceedings that was not waived by your guilty plea.  Under some circumstances a defendant also has a right to appeal the sentence; however, a defendant may waive that right as part of a plea agreement, and you've entered into a plea agreement which waives some or all of your rights to appeal the sentence itself.  Such waivers are generally enforceable, but if you believe the waiver itself is not valid in this case, you can present that theory to the appellate court.  With few exceptions, any notice of appeal must be filed within 14 days of judgment being entered in your case.  If you cannot afford a lawyer for an appeal, one will be appointed for you.

The transcript of the record in the case will be prepared for an appeal at no expense to you if you cannot afford to pay for one.  The clerk of the court can and will file a notice of appeal for you, but they don't do that automatically, only if you specifically and directly ask them to do that.

Mr. Finton, do you understand the rights I just

outlined for you?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  With respect to defendant's request for recommendation from the Court regarding assignment to Greenville, I'll be more than happy to make that recommendation.  I've checked with the Marshals Service and am informed by the marshal that Mr. Finton has shown exemplary behavior in the lock-up that they have housed him in, in Alton, been what some people might call a model prisoner, so I have no problem at all in recommending Greenville, so will make a recommendation.

Mr. Finton, I have to tell you though that a recommendation by me is just that.  It's not at all binding on the Bureau of Prisons.  As I understand it, it's one factor that they take into consideration but it is not in the least binding, so just because I make that recommendation doesn't at all mean that it will happen.

Does the United States have anything further for the record?

**MR. LONG:**  No, Your Honor.

**THE COURT:**  Does the defendant?

**MR. LUCCO:**  Nothing further, Your Honor.

**THE COURT:**  Sandy, anything else?

**DEPUTY CLERK:**  You want to dismiss Count 1?

**THE COURT:**  Will your motion to dismiss Count 1 come

in writing?

    **MR. LONG:**  I'll make it right now.  Thank for the reminder.

    We move to dismiss, without prejudice, Count 1 of the indictment, Your Honor.

    **THE COURT:**  Count 1 will be dismissed on government's motion without prejudice.

    If there's nothing further, we stand adjourned.

    *(Proceedings adjourned at 3:40 p.m.)*

                         *   *   *   *

**REPORTER'S CERTIFICATE**

I, Laura A. Esposito, Registered Professional Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter (Retired) for the United States District Court for the Southern District of Illinois.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case, that said transcript contains pages 1 through 47, inclusive, and was delivered electronically. This reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 2nd day of May 2024.

*Laura A. Esposito*
Laura A. Esposito, RPR, CRR, CRC
Official Court Reporter